## JESS HUMPHREY v. STATE.

No. A-2186. Opinion Filed February 16, 1915.

(146 Pac. 230.)

1. HOMICIDE—Submission of Issues—Manslaughter in Second Degree. In a prosecution for murder, the defendant, as a witness in his own behalf, admitted that he killed the deceased, and his defense was that he committed the act in self-defense. **Held,** that the court properly refused to submit to the jury the question of the guilt or innocence of the defendant of the crime of manslaughter in the second degree.

2. APPEAL—Harmless Error—Disqualification of Juror. As a general rule, a verdict will not be set aside for reasons that would be sufficient to disqualify a juror on a challenge for cause, which existed before the juror was sworn, but which were unknown to

the defendant until after conviction, unless it appears from the whole case that the defendant suffered injustice from the fact that the juror served in the case.

3.    JURY—Disqualification of Juror—Waiver.    A known ground of disqualification of a juror, before or during the progress of the trial, is waived by withholding it, or refusing or declining to raise the objection until after verdict.

(Syllabus by the Court.)

*Appeal from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Jess Humphrey, convicted of manslaughter in the first degree, appeals. Affirmed.

*Owen H. Rives,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

DOYLE, P. J.  The plaintiff in error was informed against for the crime of murder alleged to have been committed by killing Jess Doolin by shooting him with a pistol. Upon his trial the jury returned a verdict finding him guilty of manslaughter in the first degree, but failed to agree upon the punishment. The court rendered judgment and sentenced the defendant to be confined in the penitentiary for the term of seven years.

This case is here for the third time. *Humphrey v. State,* 3 Okla. Cr. 504, 106 Pac. 978, 139 Am. St. Rep. 972; *Id.,* 8 Okla. Cr. 449, 128 Pac. 742.

We have carefully read and examined the evidence and proceedings upon this trial, and are satisfied that the defendant had a fair trial, in which all his rights were protected. We will, however, briefly notice the assignments of error relied upon to secure a reversal of the judgment.

The state's evidence shows: That, in the afternoon on the day of the homicide, Ben Potter, a neighbor of the defendant, accompanied by his two sons, Earl and Clyde, Jess Doolin, and Babe Doolin, went fishing on Little river, near Sasakwa. That the defendant had suggested that Potter come by his house, and

perhaps that he would go too. That as Potter passed by the defendant's house he hallooed to the defendant. After the party arrived at the river, Ben Potter and Jess Doolin went across the river to get some fishing poles. While they were gone, Marshall Humphrey, a son of the defendant, and Babe Doolin had a fist fight, after which Marshall Humphrey left and went home and told his father about his fight. That the defendant gave his son Marshall a knife and said something to him about cutting Babe Doolin. After this Marshall Humphrey, Winston Humphrey, and Jess Humphrey, Jr., sons of the defendant, went to the river. Winston Humphrey approached Babe Doolin, who way lying down, and commenced kicking him in the ribs, and they commenced fighting. Jess Humphrey, Jr., said to his brother Winston, "Scratch the son of b——hs eyeballs out." At which remark Jess Doolin slapped him, shoved him down, and sat on him. Ben Potter put his hand on Jess Doolin's back, and said, "Don't hit that boy." Jess Doolin said, "Make him put his knife up;" and Ben Potter said, "He is not going to hit you with that knife." Jess Humphrey, Jr., then put his knife up. About this time the defendant Humphrey appeared and asked Jess Doolin why he slapped his boy, and saying, "I will learn you how to slap one of my boys," presented his pistol, and fired; the bullet striking Jess Doolin near the nose. He shot a second time, the ball entering under the shoulder blade. After he was shot Jess Doolin made an attempt to reach the Winchester of Ben Potter, which was lying on the bank several steps away. Potter grabbed the Winchester about the same time. They both "tusseled" for the gun; Doolin finally securing it. About that time he staggered and fell dead.

The defendant, as a witness in his own behalf, testified: That an Indian boy came to his place that day, bringing a horse which he asked the defendant to do some work on. That he did the work and gave the knife he was using to his son Marshall and told him to take it to the house and wash it. That in the meantime his son had been to the river, had the fight with Babe Doolin, had come back and told his mother about it, and he and his brother Winston had started back to the

river, and his wife had sent Jess Humphrey, Jr., to overtake them and bring them back. That he asked his wife where the boys were, and she said, "I think they have gone down on the river to have a fight with Babe Doolin." That he then went to the river with Louis Curtain, and saw Jess Doolin strike his boy in the mouth with his fist. That Ben Potter was standing about four feet from Jess Doolin. That he said to Jess Doolin, "Any man that will beat up a boy like that is a damn son of a b——h." That Jess Doolin grabbed for the Winchester in Potter's lap, and was trying to cock it, when he fired the first shot. That he fired the shots to keep Doolin from shooting him.

The foregoing facts are more or less amplified by the witnesses. What conflict of testimony there was between the witnesses for the state and for the defendant was for the jury to consider and decide. It is contended that the court erred in one of the instructions given. The charge of the court should be considered as a whole. *Updike v. State,* 9 Okla. Cr. 133, 130 Pac. 1107; *Nutt v. State.* 8 Okla. Cr. 266, 128 Pac. 165. After an examination of all the instructions in the case, and considering the charge as a whole, we think the law of the case was fully and correctly stated in the charge of the court.

It is also contended that the court erred in refusing to give an instruction on manslaughter in the second degree. In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence, in any reasonable view of it, suggests; and it is the duty of the court to say, as a matter of law, if there is any evidence that would tend to reduce the degree of the offense to manslaughter in the second degree. *Cannon v. State,* 1 Okla. Cr. 600, 99 Pac. 622. The question is: Does the evidence in the case show, or tend to show, any of the elements or ingredients of manslaughter in the second degree? A careful examination of the record discloses that there was no such evidence offered. That the defendant killed the deceased he did not deny; and his defense was that he committed the act in self-defense.

Finally it is contended that the court erred in overruling the motion for a new trial, because said motion was verified by the oath of the defendant, and therein was the following statement:

"Ninth. That one of the jurors sitting upon the trial of this cause, to wit, E. S. Gates, is a cousin by blood to the witness Ben Potter, who was the most material witness who testified for the state in this cause, and whom the testimony shows was present at the time of the homicide and carried to the scene of the difficulty and furnished to the deceased the Winchester, which was being used in making the assault by the deceased at the time of the homicide; that the defendant's counsel during the discussion of the evidence was compelled to and did criticize the testimony of the said Ben Potter, cousin, as aforesaid, of said juror which the defendant has cause to believe and does believe offended said juror; and that thereafter his actions and conduct as a juror was prejudicial to the rights of this defendant."

The record shows that the jury returned their verdict on August 16, 1913. On the same day the motion for a new trial was filed, containing the statement above quoted. The only record showing that the jurors, including the juror Gates, were ever placed on their *voir dire* is as follows:

"Both sides announce ready for trial, and the clerk of this court proceeds to call the jury into the jury box as by law required. And now, both sides having waived or exhausted all right of challenge either for cause or upon peremptory challenge, the twelve jurors now in the jury box are accepted as a jury for the trial of this cause."

It was not alleged in the motion that the defendant had no knowledge of the fact prior to the examination of the juror, nor is there any allegation that the juror corruptly qualified, nor any showing that he was interrogated as to this matter on his *voir dire* examination. We think this ground of the motion is totally lacking in every essential averment.

In *Horton v. State,* 10 Okla. Cr. 294, 136 Pac. 177, it is said:

"A defendant cannot sit supinely by and allow disqualified and incompetent jurors to be selected to try him, and then take advantage of his own indifference or negligence, nor can

a defendant call upon this court to presume that he asked a juror certain questions, in the absence of a showing in the record that such questions were asked. A known ground of disqualification of a juror before or during the progress of a trial is waived by withholding it or refusing or declining to raise the objection until after verdict. See *Queenan v. Territory,* 11 Okla. 261, 71 Pac. 218, 61 L. R. A. 324; *Id.,* 190 U. S. 548, 23 Sup. Ct. 762, 47 L. Ed. 1175. We think it may be safely said that upon principle, if the defendant accepts a juror without availing himself of the right to examine such juror on *voir dire,* for the purpose of testing his impartiality, or without availing himself of the right to challenge him for cause, and it should be discovered after verdict that he was incompetent by reason of prejudice, the defendant would not be entitled to a new trial on that ground, under our statute."

We have given careful consideration to the case, and can not discover that the record contains any prejudicial error, or that any injustice has been done the defendant.

It follows that the judgment of the district court of Seminole county should be, and the same is hereby, affirmed.

FURMAN and ARMSTRONG, JJ., concur.